**UNITED STATES of America**

v.

**Parris Raymond JEFFERSON, Appellant.**

No. 91–3136.

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1992.

Decided Sept. 15, 1992.

---

Shawn Moore, Washington, D.C., for appellant. Michele A. Roberts, Washington, D.C., also entered an appearance for appellant.

Linda Otani McKinney, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and Carol A. Fortine, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before SILBERMAN, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge WILLIAMS.

BUCKLEY, Circuit Judge:

Parris Raymond Jefferson was convicted after a jury trial of possession of more than fifty grams of cocaine base with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii), and of using a firearm in connection with drug trafficking, in violation of 18 U.S.C. § 924(c)(1). He argues that the trial court improperly

denied his motion for a continuance in order to change counsel on the day of trial and that insufficient evidence supported the jury's finding that he used a firearm during and in relation to drug trafficking. Finding no merit in either contention, we affirm.

## I. BACKGROUND

On November 7, 1989, District of Columbia Metropolitan Police Officers Phillip Parker and Nathaniel Covington received a radio broadcast directing them to report to 636 Quebec Place, N.W., to look for a man meeting a particular description who was said to have a handgun. Upon arriving at the address, the officers saw Jefferson on the sidewalk and noted that he matched the description. They then stopped and frisked him, but found no gun.

At that time, Jefferson's mother, Geraldine Hamilton, came outside and asked to speak to the officers. She told them that she suspected that her son was engaged in various "drug activities" and consented to a search of the backyard. On searching the area, the police found a loaded, sawed-off 12-gauge shotgun and over 300 multicolored ziplock bags containing over seventy grams of cocaine base (crack). The shotgun and a portion of the ziplock bags were discovered in a lawnmower grass-catcher bag in a stairwell beneath the back porch of the house; the remaining bags were found hidden in a shed.

The police then obtained a written consent from Jefferson to search his room. In it, the police recovered a safe, pager, razor blade, paint scraper/cutter, two ziplock bags with crack, and a number of multicolored ziplock bags. Jefferson was arrested, informed of his rights, and taken to the station for questioning.

At the station, Jefferson gave the following statement, which was read into evidence at trial:

QUESTION: Parris, in your own words, can you tell me about what you know about the narcotics that your mother told the police about that were found in your yard? Also, can you tell me what you know about the sawed-off shotgun?

ANSWER: I know my mother called the police about me, and I don't want to get in trouble. So on Saturday I put the narcotics out in the yard, so my mother wouldn't find them in the house. I don't sell the drugs. I just hold them for the other boys to come around and pick them up when they need them.

The shotgun belongs to everyone in the neighborhood, and when they need it, they come and get it and do what they have to do and then put it back.

Do you know this boy named Eric who lives over on Quincy Street? We have some trouble with him, and there was some shooting, and the shotgun came in handy.

. . . .

QUESTION: Who were you holding the cocaine for?

ANSWER: A guy named [name redacted] drops it off for me. . . .

QUESTION: Does. . . . Does John Doe give you any money for holding the drugs for him?

ANSWER: Yes. . . . He gives me about $500 a week to keep the stuff.

. . . .

QUESTION: Have you ever sold any of the drugs[?]

ANSWER: Yes, to pipeheads over on Rock Creek Church Road.

. . . .

QUESTION: Tell me more about the shotgun.

ANSWER: Mike gave me the gun to hold so in case we ever got in trouble, we could use it to keep them off us, like the time I told you about Eric coming over at us with his gun.

Trial Transcript, January 7, 1991 ("Tr.") at 85–87.

On the morning of trial, one year and two months later, Jefferson's attorney, Richard Stern, informed the court that Jefferson's family had retained Shawn Moore to represent him and moved for a continuance to allow Moore to prepare for trial. Moore stated that he had been contacted by the family three days earlier and was not ready to proceed. The court denied the motion for continuance, stating:

I have a trial calendar of criminal cases that is just chockablock. If I were to continue this, I don't know when I could try it. So I am denying the motion, and we will go to trial today.

*Id.* at 3. The court did invite Moore to "sit at the counsel table ... and participate." *Id.* at 4.

At trial, the Government offered testimony of the officers involved in the search and arrest, Jefferson's statement, and the expert testimony of Officer David Stroud. The officer testified that drug traffickers use safes to store money, drugs, and effects; razors to cut crack into smaller pieces; pagers to communicate with each other and customers; and guns to protect the drug operation or keep employees in line. The jury convicted Jefferson on both counts, and he was sentenced to consecutive periods of imprisonment of 120 months on the drug charge and sixty months on the firearm charge. This appeal followed.

## II. Discussion

### A. Denial of Motion for Continuance

Jefferson claims that his Sixth Amendment right to "the Assistance of Counsel for his defence[,]" U.S. Const. amend. VI, was violated by the district court's denial of his motion for a continuance. The Supreme Court has made clear, however, that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel[,]" as "judges necessarily require a great deal of latitude in scheduling trials." *Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983). Thus, we have held that "[a] trial judge enjoys great discretion in ruling on a motion for a continuance," and we review the court's decision only to determine "whether the judge 'clearly abused' his discretion." *United States v. Poston,* 902 F.2d 90, 96 (D.C.Cir.1990) (citation omitted). The factors relevant to this inquiry include

the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; [and] whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature.

*United States v. Burton,* 584 F.2d 485, 490–91 (D.C.Cir.1978) (footnotes omitted), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979).

■ We conclude that the court acted well within its discretion in denying the motion for continuance. Plainly, it would have been extremely inconvenient to the court and the Government to reschedule the case on the day of trial. Moreover, while Stern had represented him for more than one year, Jefferson failed to offer a reason for his delay in retaining new counsel. The timing of his motion makes it appear dilatory. Without a doubt, Jefferson's failure to act earlier "contributed to the circumstance which gives rise to the request for a continuance." *Id.* at 491. Furthermore, Stern was prepared to try the case and, by all accounts, did so professionally. Quite reasonably, the judge offered Moore the opportunity to assist in the case. No prejudice has been shown as the result of Stern's handling of the defense.

The facts of this case are similar to those in *Poston,* where we upheld the district court's denial of a motion for continuance. There, a court-appointed attorney represented Poston for the four months between his arraignment and the trial date. Poston sought to replace his counsel the day before trial. We held that "[a]t that point, granting a continuance would have significantly disrupted the schedules of the court and the prosecution." *Poston,* 902 F.2d at

97. We also stated that as "Poston provided no justification for the delay in selecting new counsel, the trial court could reasonably have concluded that his motion was 'dilatory, purposeful, or contrived.'" *Id.* (quoting *Burton,* 584 F.2d at 491 (footnote omitted)). *See also United States v. Rettaliata,* 833 F.2d 361, 362 (D.C.Cir.1987) (upholding denial of motion for substitute counsel on day of trial). Therefore, we hold that the district court's denial of the motion was a proper exercise of its discretion.

## B. Use of the Shotgun

Jefferson also claims that there was insufficient evidence for the jury to find that he used the shotgun "during and in relation to" drug trafficking, as required by 18 U.S.C. § 924(c)(1) (1988). As a jury has found Jefferson guilty, we must consider the evidence in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), recognizing that "[a] jury is entitled to draw a vast range of inferences from evidence[.]" *United States v. Long,* 905 F.2d 1572, 1576 (D.C.Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). We will affirm if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

Turning to the statute, section 924(c)(1) reads, in pertinent part:

Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years.

On appeal, Jefferson does not dispute that the loaded, sawed-off shotgun is a "firearm" or that he committed a "drug trafficking crime." At the same time, the Government does not contend that Jefferson "carried" the shotgun. Our analysis must therefore concentrate on whether Jefferson "used" the weapon "during and in relation to" the drug trafficking crime.

A careful reading of our cases reveals that these elements of the statute establish two evidentiary requirements. First, they require proof of a "nexus ... between a particular drug offender and the firearm." *Long,* 905 F.2d at 1577. This connection may be shown vicariously, as when a defendant engages in a conspiracy. *See id.* at 1577 n. 8 (noting possibility of conspiring in or aiding or abetting another's use of a weapon); *United States v. Powell,* 929 F.2d 724, 726–28 (D.C.Cir.1991) (discussing knowledge required for accomplice liability under § 924(c)). Second, they require evidence "that the guns facilitate[d] the predicate offense in some way." *United States v. Harris,* 959 F.2d 246, 261 (D.C.Cir.1992). *See also United States v. Anderson,* 881 F.2d 1128, 1141 (D.C.Cir. 1989) (requiring "evidence from which the jury could reasonably infer that the guns were an integral part of the drug trafficking operation"). Both elements must be proven to establish criminal liability under section 924(c). If the evidence cannot support the conclusion that Jefferson had actual or constructive possession of the shotgun and that the gun was used in connection with his drug offense, we must reverse his conviction.

### 1. *Jefferson's Possession of the Shotgun*

It is well established that "a defendant can 'use' a firearm without actively employing it," *Long,* 905 F.2d at 1576, and that "[f]irearms actually need not be brandished in order to be used or carried in connection with a drug-trafficking offense." *United States v. Evans,* 888 F.2d 891, 896 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990). Instead, the Government can prove a sufficient nexus between Jefferson and the gun by showing that he "actually or constructively possessed it." *United States v. Harrison,* 931 F.2d 65, 71 (D.C.Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 408, 116 L.Ed.2d 356 (1991). "Constructive possession exists when one knowingly is in a position to exercise dominion

and control over the object possessed[.]" *Id.*

■ Jefferson relies on our decision in *Long* to argue that he did not possess the weapon. In that case, we reversed a conviction under the statute where the only evidence connecting Long to an unloaded handgun found protruding from a sofa cushion in his co-defendant's apartment was his presence in the apartment. We emphasized that "the government failed to adduce *any* evidence suggesting that Long actually or constructively possessed the revolver." *Long,* 905 F.2d at 1578 (footnote omitted) (emphasis in the original). *See also United States v. Johnson,* 952 F.2d 1407, 1411–12 (D.C.Cir.1992) (insufficient evidence of constructive possession of firearm where defendant merely present in co-defendant's apartment where gun was found). In this case, however, Jefferson admitted receipt and control of the weapon. *See* Tr. at 87 ("Mike gave me the gun to hold"). Jefferson also made statements that the jury could reasonably construe as acknowledging his continued possession and use of the gun. See *id.* at 85 ("the shotgun came in handy"); *id.* at 87 ("we could use it to keep them off us, like the time I told you about Eric coming over at us with his gun"). Finally, the facts that Jefferson lived in the house and that similar, multicolored ziplock bags were found in both his room and near the weapon support an inference of constructive possession of the weapon. *See Anderson,* 881 F.2d at 1141.

### 2. *The Shotgun's Relationship to the Drug Offense*

■ "[M]ere possession of a gun at the time a crime is committed is not enough to establish" a violation of section 924(c), *United States v. Bruce,* 939 F.2d 1053, 1054 (D.C.Cir.1991); the Government must also prove a connection between the firearm and the underlying drug offense. This connection is at the heart of the statute, which was intended to combat the deadly confluence of drugs and guns in our society. *See Harris,* 959 F.2d at 262 (The "introduction [of guns] into the scene of drug transactions dramatically heightens the danger to society.").

In this case, Jefferson was charged with violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii) (1988), which make it a crime to possess cocaine base with the intent to distribute it. "Since possession with intent subsequently to distribute is in a sense a passive crime, it becomes somewhat difficult analytically to determine how one goes about using a gun in relation to that crime." *Bruce,* 939 F.2d at 1055. *Bruce* resolved this difficulty by requiring proof of a relationship between the gun and the possession, not merely the intended future distribution, of the drugs. *Id.* at 1055–56.

In *Bruce,* the weapon, a small .22–caliber derringer, was found in a coat pocket hanging in a closet in the defendant's apartment along with a cache of drugs. We reversed the defendant's conviction under section 924(c) for lack of evidence. While we found the proximity of the drugs to the gun and the expert testimony that "in today's operations drugs and guns go hand in hand" sufficient to prove that the derringer was intended to protect a future distribution of the drugs, *id.* at 1055 (footnote omitted), we found no evidence that it was used to safeguard the cocaine prior to distribution, *see id.* at 1055–56. Unlike the case in *Evans,* 888 F.2d at 896, there was no evidence of Bruce's past use of the derringer to protect the drugs. *See Bruce,* 939 F.2d at 1056. And whereas, in *Anderson,* a .32–caliber revolver and a sawed-off shotgun were found along with drugs in a "crack house" where the drugs were stored and packaged for distribution, 881 F.2d at 1131, the derringer in Bruce's possession was not the type of gun typically used to protect such an operation, *Bruce,* 939 F.2d at 1055.

■ Jefferson argues that none of the evidence in his case supports the necessary relationship between the weapon found in the lawnmower grass-catcher bag and its use to protect the drugs in his possession. He maintains, therefore, that we are required by *Bruce* to reverse his conviction. We disagree. We find that there was ample evidence to enable a reasonable jury to

infer that the shotgun was used to protect the crack in his possession. Proof of Jefferson's past use of the weapon, his access to it for protection, and the weapon's lethal nature are more than sufficient to show that the firearm was used "during and in relation to" his possession of the drugs.

First, our prior cases recognize that evidence of the past use of the weapon can help establish the necessary nexus. For example, in *United States v. Laing,* 889 F.2d 281, 286, 289 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482, 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990), we upheld the convictions of two defendants under section 924(c) based, in part, on evidence of their past use of a handgun and machine gun in connection with their drug activities. Similarly, in affirming the conviction in *Evans,* we cited evidence that the defendants had brought the guns and drugs from New York to Washington and had used them in New York to threaten a subordinate. *Evans,* 888 F.2d at 895, 896. "This evidence," we concluded, "suggests that the guns were, in fact, used to protect the drug stash." *Id.* at 896.

█ In this case, Jefferson stated that Mike gave *me* the gun to hold so in case we ever got in trouble, *we* could use it to keep them off *us,* like the time I told you about Eric coming over at *us* with his gun.

Tr. at 87 (emphases added). We find that this statement, together with the drugs found in Jefferson's room and in the yard alongside the shotgun and Jefferson's acknowledgment that he held the drugs "for the other boys to come around and pick[ ] up," *id.* at 85, would enable a reasonable jury to conclude that the gun had been given to Jefferson for the purpose of protecting the drugs that had been entrusted to him, and that it had been so used.

At the same time, we find that there was sufficient evidence to support the conclusion that the weapon remained accessible to him. It is unclear from the record whether Jefferson always kept the shotgun in the grass-catcher, or whether he hid it there at the time he removed the ziplock

bags of crack from his bedroom. Either way, the question is whether the evidence could reasonably support a finding that the gun was sufficiently available to him for purposes of section 924(c)(1).

We conclude that it was. The gun was located in the grass-catcher bag next to drugs that Jefferson had removed from the house. The jury thus could reasonably have inferred that the shotgun was sufficiently accessible to protect the defendant's possession of the drugs in light of his statement as to past use of the gun.

Here, the ongoing offense was the possession of the crack with intent to distribute it, not its actual sale. The source of a threat would come from someone seeking access to the premises, not from someone who had already gained access to them in the guise of a prospective customer. This distinguishes this case from those in which the drugs are kept and sold in a particular room. In such cases, courts have required that the firearm be immediately available to a defendant in that room. *See, e.g., United States v. Feliz–Cordero,* 859 F.2d 250, 252–54 (2d Cir.1988) (no access to firearm kept in dresser drawer in a second floor apartment where defendant kept and sold drugs in a third floor apartment); *see also United States v. Lyman,* 892 F.2d 751, 754 (8th Cir.1989) ("Having a loaded gun present in the same area where transactions took place makes it more likely that the gun would have been available if needed[.]"), *cert. denied,* —— U.S. ——, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990). Whether the loaded shotgun was located in Jefferson's bedroom closet or in its hiding place in the yard is less relevant than whether he had ready access to it in the event of an emergency. *See id.* at 752–53, 754 n. 4 (discussing cases and concluding that key is whether placement of gun suggests it "would be quickly available for use in an emergency.").

Finally, our cases indicate that the type and number of weapons may also be relevant to the question of use. Thus, in *Bruce,* we remarked that "a small derringer.... is hardly the sort of weapon a drug dealer would employ for protection

against an effort to penetrate a crack house." *Bruce*, 939 F.2d at 1055. Conversely, we have found, in several "crack house" or "drug fortress" cases, that protection of a drug operation may be presumed from the amount of firepower discovered on the premises. In *Anderson*, for example, the police found two revolvers and a sawed-off shotgun in a home littered with drugs and paraphernalia. We concluded that this was sufficient evidence that the guns were present "to protect [the] drug traffickers and their investment." *Anderson*, 881 F.2d at 1141. *See also United States v. Matra*, 841 F.2d 837, 838–41 (8th Cir.1988) (sufficient evidence where three pistols, semiautomatic pistol, semiautomatic rifle, assault rifle, submachine gun, and shotgun found in fortified cocaine house); *United States v. Grant*, 545 F.2d 1309, 1311–12 (2d Cir.1976) (affirming conviction where two revolvers, two semiautomatic pistols, and an automatic rifle found in a "veritable fortress"), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977).

The single sawed-off shotgun found in the backyard falls short of the impressive armory described in these "crack house" cases. But unlike the derringer in *Bruce*, a 12–gauge shotgun is a formidable firearm—as attested by the virulent rap song "Cop Killer." *See* Ice–T, *Cop Killer, on* Body Count (Warner Bros. Records 1992) ("I got my twelve gauge sawed off ... I'm 'bout to dust some cops off."). A jury could reasonably conclude that the gun was appropriate for the protection of the drugs in Jefferson's possession, and that it was so used.

### III. Conclusion

We conclude that the evidence presented to the jury supports a reasonable inference that Jefferson had effective control over and ready access to a firearm used for the protection of the crack cocaine in his possession. As we also find that the district court acted within its discretion in denying Jefferson's motion for a continuance to re-

place his counsel on the day of trial, the conviction is

*Affirmed.*

STEPHEN F. WILLIAMS, Circuit Judge, dissenting:

I am not persuaded that a jury could reasonably find beyond a reasonable doubt that Jefferson violated 18 U.S.C. § 924(c)(1), i.e., possessed his weapon for the purpose of protecting his drug possession activity. The majority points to evidence in three categories to support the conviction on that count—(1) a statement by Jefferson relating to past use of the gun, (2) his access to it, and (3) the type of gun. Both of the first two seem to me to have serious weaknesses; the third alone is not enough.

*Past Use.* The argument here rests on Jefferson's reference, quoted at pages 203 and 207 of the Opinion, to his keeping the gun so that "we [Jefferson and his allies] could use it to keep them off us," "them" being one Eric and his confederates, who had "come over" with their gun at least once. Nothing in that statement ties the gun to the drugs, unless we assume that people might threaten Jefferson and his allies *only* in order to capture their drug stash. But modern America is evidently full of gangs who attack each other for all kinds of non-drug reasons. The hero of *Boyz 'n the 'Hood*, who kept a gun in anticipation of an assault by his foes (whose quarrel with him was not drug-related), could have used Jefferson's very words.

The opening passages of the colloquy, see Op. at 203, may help the prosecution a little, but not much: Jefferson talks of drugs, and then he talks of the gun. That was natural enough, regardless of any link between the two; he was asked about both, one after the other, and he responded, addressing first one and then the other. (Interestingly, the transcriber perceived Jefferson as starting a new paragraph when he launched into discussion of the gun.) The only link is in the eye of the beholder.

*Easy Access.* The majority states, "The jury ... could reasonably have inferred

that the shotgun was sufficiently accessible to protect the defendant's possession of the drugs in light of his statement as to past use of the gun." Op. at 207. But what could the jury rely on to support such a belief? Jefferson had placed his drugs outside the house, to hide them from his mother. The gun was also outside the house, in a grass-catcher. Thus the gun would be of use against a marauder in quest of the drugs only if Jefferson managed to get to it first. Whereas proximity to a place where drugs are actually being sold indicates that a gun facilitated drug sales (compare *United States v. Lyman*, 892 F.2d 751, 754 (8th Cir.1989)), mere proximity to a place where a defendant stores drugs and that is only rather technically under his control does not. If anything, for Jefferson to keep a gun near the very item he wanted to safeguard, and beyond the direct control of him or any member of his clique, would seem a poor stratagem, and thus an implausible one.

While the past-use evidence would suggest accessibility if Jefferson *always* kept the gun in the grass-catcher (*and* if the past uses were solidly linked to drugs), the majority rightly notes that he may have placed it there at the time he moved the crack outdoors. Op. at 207. If this is true (and it seems at least as probable as the alternative), the past-use evidence does nothing to fill the gap.

*Gun Types.* The majority here successfully distinguishes the lowly derringer that was involved in *United States v. Bruce*, 939 F.2d 1053 (D.C.Cir.1991), but no court appears to have relied solely on evidence that a gun's physical characteristics made it suitable for protection of a drug enterprise.

The outcome here seems to me virtually indistinguishable from inferring a guns-drug link simply from the presence of the two, a position we have flatly rejected. See *Bruce*, 939 F.2d at 1054–55. I dissent.