**UNITED STATES of America**

v.

**Robert MORRIS, Appellant.**

No. 91–3151.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 18, 1992.

Decided Oct. 9, 1992.

Robert L. Tucker, Asst. Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, were on the brief, for appellant.

Edward G. Burley, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, and J. Jiyoung Bang, Asst. U.S. Attys., were on the brief, for appellee.

Before WALD, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Separate statement filed by Circuit Judge SILBERMAN.

WALD, Circuit Judge:

Appellant Robert Morris was convicted of possession of cocaine with intent to sell, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(iii), and for using or carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). He appeals both convictions on the ground that the evidence was insufficient to support either charge. We reject both challenges and affirm the judgment below.

## I. BACKGROUND

On December 11, 1990, officers of the Metropolitan Police Department executed a search warrant on a one-bedroom apartment at 2525 14th Street, N.E., in the District of Columbia. Upon entering the apartment, the officers found appellant seated on a small couch in the living room; they detained him while they searched the apartment. The search produced two ziplock bags containing a total of 15.7 grams of crack cocaine divided among 100 smaller ziplock bags, $500 in cash, empty ziplock bags, razor blades, and three loaded and operable pistols. Two of the guns were under the cushions of the couch on which appellant sat; the third was in a nightstand in the bedroom. The cocaine and the cash were in an air duct vent in the ceiling of the bedroom. In the drawer of a dresser in the bedroom, the officers found two birthday cards; appellant's name was on the envelope of one, and the other was for a "son," signed "Mr. and Mrs. B.G. Morris" and dated November 30, 1990. No address was on either. In a hallway closet, the officers found a laundry ticket dated December 3, 1990, and bearing the name "E. Morris." There were no identifiable fingerprints on any of these items. The officers arrested appellant, who was indicted on two counts: possession with intent to distribute in excess of five grams of cocaine base and using or carrying a firearm in relation to the possession offense.

At trial, two officers testified that at the time of the search, Morris said that he had been living in the apartment for three or four weeks. The government also offered expert testimony that the quantity and the packaging of the drugs, together with the drug paraphernalia and the weapons, indicated that the apartment was a drug distribution center, where cocaine was repackaged for street sale.

At the close of the government's case, appellant moved for acquittal on the ground that the evidence showed only that he was a casual visitor to the apartment and not a participant in the drug operation. The court denied the motion. Morris then testified, denying that he had ever lived in the apartment or ever said that he lived there. He testified instead that he was visiting four friends who lived there and had been there only a few minutes when the police arrived. He said that he was not himself engaged in any drug trafficking or aware of the presence of the drugs in the apartment. He had left the cards there during a prior visit on his birthday.

At the close of all the evidence, appellant renewed his motion for acquittal, which the court again denied. The jury convicted appellant of both charges, and he was sentenced to 130 months.

## II. DISCUSSION

### A. *Standard of Review*

■ In this appeal, appellant challenges the sufficiency of the evidence to support each conviction. In such challenges, this court must defer to the jury's determination and affirm the conviction if " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Long*, 905 F.2d 1572, 1577 (D.C.Cir.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979)), *cert. denied,* —— U.S. ——, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). In our review, we must "view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the jury to determine the weight and credibility of the evidence." *United States v. Sutton*, 801 F.2d 1346, 1358 (D.C.Cir.1986).

### B. *Possession of the Drugs*

■ Appellant's first challenge is to the sufficiency of the evidence to sustain his conviction for possession of cocaine with intent to distribute. Possession, of course, can be either actual or constructive. Constructive possession requires evidence supporting the conclusion that the defendant had the ability to exercise knowing "dominion and control" over the items in question. *United States v. Hernandez*, 780 F.2d 113, 116 (D.C.Cir.1986). Mere

proximity to the item at the time of seizure is not enough; but proximity coupled with "evidence of some other factor—including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise" is enough to sustain a guilty verdict. *United States v. Gibbs,* 904 F.2d 52, 56 (D.C.Cir.1990).

A jury is entitled to infer that a person exercises constructive possession over items found in his home. *United States v. Jenkins,* 928 F.2d 1175, 1179 (D.C.Cir.1991). Thus, if there was sufficient evidence from which a juror could infer that Morris lived in the apartment where he was arrested, the jury could infer that he constructively possessed the drugs. The jury had the following evidence that Morris lived in the apartment: First, two officers testified that Morris said he lived there. Although Morris himself testified to the contrary, the jurors were permitted to credit the testimony of the officers. *Jenkins,* 928 F.2d at 1178. Moreover, Morris himself may have given their testimony extra credibility by his own contradictory information about where he did live at the time of the arrest. Second, Morris admitted that the two birthday cards found in the bedroom were his. That the cards were found inside the dresser drawer in another part of the house, rather than, say, left on a coffee table beside the defendant, strengthened the inference that Morris occupied the apartment on more than a drop-in basis. In *United States v. Williams,* 952 F.2d 418 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 148, 121 L.Ed.2d 99, (1992), for example, this court found it relevant that defendant's possessions were found "not in the living room where [he] was arrested, but in [the] bedroom." *Id.* at 420. Third, the officers found a dry cleaning ticket marked "E. Morris" in the hall closet. Morris's middle name is Eugene. Together these items of evidence support a reasonable inference that Morris lived in the apartment and,

therefore, exercised constructive possession over its contents.

The inference that a person who occupies an apartment has dominion and control over its contents applies even when that person shares the premises with others, *Jenkins,* 928 F.2d at 1179, but it is particularly strong when the jury can reasonably conclude that he is the sole occupant of the premises. Appellant testified that not he but "four friends" lived in the apartment. Neither appellant nor the government claimed that he was the fifth occupant. Other than appellant's testimony, however, which the jury was permitted to disbelieve, there was no evidence that anyone other than appellant lived in the apartment, and certainly no one else was present when the arrest was made and the drugs seized. Thus, there was ample evidence from which the jury could infer that Morris lived alone in the apartment and exercised constructive possession over its contents.

There was also evidence aplenty from which a jury could infer intent to distribute. This intent can be inferred from a combination of suspicious factors. *Gibbs,* 904 F.2d at 57. The presence of the paraphernalia—razors and drug packaging materials—was evidence of such an intent, *United States v. Dunn,* 846 F.2d 761, 764 (D.C.Cir.1988) (citing *United States v. Castellanos,* 731 F.2d 979, 985 (D.C.Cir.1984)), as was the presence of the guns, *United States v. Bruce,* 939 F.2d 1053, 1056 n. 2 (D.C.Cir.1991) (citing *Dunn,* 846 F.2d at 764). Additionally, a government expert testified that the quantity and packaging of the drugs found in the apartment indicated that they were intended for street sale.

Because there was sufficient evidence both of appellant's possession of the drugs and of his intent to distribute them, we affirm his conviction for the possession offense.

C. *Guns Used or Carried in Relation to the Trafficking Offense* [1]

Appellant's second challenge is to the sufficiency of the evidence to support

---

1. Since the statute defines the offense as either "using *or* carrying" a firearm, the jury could

convict if the evidence was sufficient to support either type of conduct. Where, as here, the jury

his conviction for using or carrying a gun in relation to a drug trafficking offense. Morris was convicted under a statute that makes it a crime to "use[ ] or carr[y]" a firearm "during and in relation to any ... drug trafficking crime...." 18 U.S.C. § 924(c).

Case law from this and other circuits provides guidance in determining when someone "uses or carries" a gun in relation to a drug trafficking offense. The first principle is clear: Mere possession of a gun even by a drug trafficker does not violate the statute. As we observed in *United States v. Bruce*, 939 F.2d at 1053, when Congress wishes to criminalize the possession of a firearm, it knows how to do so. In *Bruce*, this court recognized the analytical difficulty in distinguishing those cases in which someone merely possesses a gun with the *intent* to use it in a future drug trafficking crime, such as an intended sale—which does not violate § 924(c)— from those cases in which someone actually *uses* the gun in relation to the trafficking crime, such as a current sale or to protect current possession in anticipation of a future sale—which does violate § 924(c). *Id.*

Apart from the basic requirement that "use" constitute more than simple possession, (*United States v. Long*, 905 F.2d 1572, 1577 (D.C.Cir.1990)), we have construed the term as broad enough to encompass any case in which the gun facilitated or had a role in the trafficking offense. *United States v. Harris*, 959 F.2d 246, 261–62 (D.C.Cir.1992) (using guns as medium of

exchange violated the statute). Put another way, we ask whether the gun was "an integral part" of the drug trafficking operation in question. *United States v. Anderson*, 881 F.2d 1128, 1141 (D.C.Cir. 1989). "Use" does not require that the defendant fire the gun or even brandish it. *United States v. Evans*, 888 F.2d 891, 896 (D.C.Cir.1989) (citing *United States v. Matra*, 841 F.2d 837, 841–43 (9th Cir.1988); *United States v. Mason*, 658 F.2d 1263, 1270–71 (9th Cir.1981); *United States v. Moore*, 580 F.2d 360, 362 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978)), *cert. denied sub nom. Curren v. United States*, 494 U.S. 1019, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990).

This court has identified a number of factors to aid in determining whether guns found at the scene of a drug trafficking offense were in fact "used" in relation to that offense. We discuss only some of them here, recognizing that courts have identified and will identify others. First, the defendant's possession of the gun is an important factor. Generally speaking, it would be difficult to "use" a gun without exercising dominion and control over it.[2] Possession, of course, encompasses joint, as well as constructive possession. *United States v. Gibbs*, 904 F.2d 52, 57 (D.C.Cir. 1990). Second, the court considers the accessibility of the gun to the defendant. A gun kept close at hand is more likely being used for protection than a gun packed away in a hard-to-reach spot. *Cf. United States v. Jefferson*, 974 F.2d 201, 207

---

returned a general verdict, we must affirm if the evidence was sufficient to support either theory. *Griffin v. United States*, —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991).

We analyze this as a "use" case, as the stronger inferences from the evidence suggest that the guns were being used to protect the drugs that were in appellant's possession. We note, however, that under our case law, the evidence could also support a charge of "carrying" the two guns found under the couch on which Morris was sitting. *See United States v. Evans*, 888 F.2d 891, 895 (D.C.Cir.1989) ("carrying" comprehends having weapon within reach and available); *United States v. Anderson*, 881 F.2d 1128, 1140–41 (D.C.Cir.1989) (weapon is "carried" if it is on or about one's person or convenient of access and within reach). In either instance, of

course, the "using" or "carrying" must be "in relation to" the predicate offense, in this case, possession with intent to distribute. To affirm a "carrying" conviction, we would employ the same analysis as we use here, linking the guns to the possession of the drugs.

2. In *United States v. Long*, 905 F.2d 1572, 1577 (D.C.Cir.1990), we recognized that a defendant who had not actually or constructively possessed a gun might still be convicted under § 924(c) if he aided and abetted another's use of the firearm or was held vicariously liable for a co-conspirator's use. We do not address today whether there may be other cases in which a "use" of a firearm could satisfy the statute without satisfying the technical rubric of possession. *See id.* at 1582 (Sentelle, J., concurring).

(D.C.Cir.1992) (gun placed outside remained sufficiently accessible to support inference that it was "used" for purposes of 924(c)).

The proximity of the gun to the drugs is a third factor which, however, may cut either way, depending upon the particular facts. In *Bruce,* for example, the gun and the drugs were both found in the pocket of a raincoat hanging in a closet. We concluded that the gun appeared to be intended for use only at the time of a future distribution. *Id.* at 1055. In other cases, particularly those involving a drug distribution center, the gun's proximity to the drugs or to other indicia of a trafficking operation may support the inference that the gun was an integral part of the operation. *See, e.g., Anderson,* 881 F.2d at 1141; *see also Jefferson, supra,* 974 F.2d at 207 (where defendant had admitted to past use of gun, its proximity to drugs supported inference that it was used to protect drugs); *United States v. Williams,* 952 F.2d 418, 421 (D.C.Cir.1991) (in premises used for drug distribution, proximity of guns to drugs and drug paraphernalia supports conviction under 924(c)). *See also United States v. Hadfield,* 918 F.2d 987, 988 (1st Cir.1990) (location of operable firearm "in close proximity to a room or rooms in which drug distribution, processing, or storage occurs" supports inference of its use in connection with the predicate offense), *cert. denied,* —— U.S. ——, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991). The permissible inferences that can be drawn from the proximity of the gun to the drugs, in the final analysis, depend on the facts of each case.

A fourth factor is whether the gun is loaded. *See Anderson,* 881 F.2d at 1141; *Dunn,* 846 F.2d at 764. Although the brandishing or display of even an unloaded gun can have a powerful deterrent effect and therefore play a role in protecting drugs and drug proceeds, the fact that a gun is loaded strengthens the inference that it is in actual use. Fifth, the number and type of guns may also be relevant to the question of their "use." *Jefferson, supra,* 974 F.2d at 207; *Williams,* 952 F.2d at 421. As to the type, we have found some relevant distinctions between an orna-

mental, but operative, belt-buckle derringer, which we deemed an unlikely arm to protect a crack house, *Bruce,* 939 F.2d at 1055, and a sawed-off shotgun, which we recognized as a "formidable firearm" for the same purpose. *Jefferson, supra,* 974 F.2d at 208. As to the number, we have found some significance in the existence of an "arsenal" of weapons, *see Williams,* 952 F.2d at 421, while recognizing that the use of a single gun can violate the statute. *See Jefferson, supra,* 974 F.2d at 207. In general, the presence of several guns throughout the premises strengthens the inference that they are intended to protect the stash.

■ The conclusion that the gun was actually used in relation to the trafficking offense can also be buttressed by an expert identifying the indicia of a drug trafficking operation—including, but not limited to, the quantity, composition and packaging of the drugs, the presence of drug paraphernalia, weapons, and large amounts of cash, the location of the premises in an area known for such activity, and the well-nigh universal use of guns to protect such operations. *See United States v. Williams,* 952 F.2d 418, 421 (D.C.Cir.1991); *United States v. Jenkins,* 928 F.2d 1175, 1179 (D.C.Cir. 1991); *United States v. Anderson,* 881 F.2d 1128, 1141 (D.C.Cir.1989); *United States v. Dunn,* 846 F.2d 761, 764 (D.C.Cir. 1988). Finally, we have considered relevant the defendant's recent use of the gun in relation to drug trafficking. *Jefferson, supra,* 974 F.2d at 207; *United States v. Laing,* 889 F.2d 281, 286 (D.C.Cir.1986), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990); *Evans,* 888 F.2d at 895, 896.

In determining specifically whether a gun was used to protect the stash of drugs intended for distribution, as opposed to their actual distribution, some cases have focused on the open display of the gun as a deterrent to poachers. *See, e.g., United States v. Williams,* 923 F.2d 1397 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991). This is not to say, however, that a gun that is within reach, though out of sight, does not also strongly suggest its intended use for

protection of the drugs. *See, e.g., United States v. Meggett*, 875 F.2d 24, 29 (2d Cir. 1989) ("Possession of a gun, even if it is concealed, constitutes use if such possession is an integral part of the predicate offense and facilitates the commission of that offense."), *cert. denied sub nom. Bradley v. United States*, 493 U.S. 858, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989); *United States v. Stewart*, 779 F.2d 538, 540 (9th Cir.1985) (guns "embolden[ ] an actor who ha[s] the opportunity or ability to display or discharge the weapon ... whether or not such display or discharge in fact occur[s]"), *cert. denied*, 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987).

▮ Against this backdrop, we now consider the facts of this case, in light of the factors discussed, and, of course, also in the light most favorable to the government, *United States v. Sutton*, 801 F.2d 1346, 1358 (D.C.Cir.1986). The government claimed that Morris was "using" the three guns to protect the stash of drugs. It is well established that "when guns are present in order to protect contraband they may be deemed to be used in relation to the underlying felony [possession with intent to distribute]." *Evans*, 888 F.2d at 896. From the evidence in this case, we conclude that a jury could reasonably infer that Morris was using these firearms to protect the drugs in the apartment intended for future distribution.

First, there was plentiful evidence that Morris occupied the apartment and exercised constructive possession over its contents. Second, two of the guns were readily accessible to him, both within easy reach under the cushions of the couch on which he sat. He thus easily fulfilled two of the three factors generally looked to to prove possession of a firearm in § 924(c) cases. *See Long*, 905 F.2d at 1579 (possession most commonly shown by proximity to the firearm, possessory interest in the firearm, or dominion and control over the premises on which the firearm was located). The positioning of the two guns in the couch also placed them near the door through which an intruder might be expected to enter the apartment. The third gun, which was in a nightstand drawer in the bedroom, was closer to the drugs, which were in a duct in the bedroom ceiling; the bedroom was the room in which jurors could infer that appellant slept. Jurors could thus reasonably infer that all three guns were strategically placed throughout the apartment in order to protect the drugs that appellant possessed.

All three guns were loaded and fully operable. Two were .22 caliber pistols, and one was a .38 caliber pistol. While three pistols may not an arsenal make, they are not strangers to the drug trade, *see Dunn*, 846 F.2d at 764, and together they generously support an inference that their presence was geared to protecting the drugs stored in the apartment. Finally, the government offered expert testimony that the apartment was a drug packaging and distribution center. The government's expert testified that the quantity and packaging of the drugs indicated that they were intended for street sale; that drug dealers frequently "stash" their drugs in ceiling air vents because drug-sniffing dogs won't detect them there; and that someone who was involved in this kind of operation would typically use a gun to protect himself from "stick-up boys," competing dealers, or even from his street salesmen.

Because this evidence, taken as a whole, would certainly permit a reasonable juror to infer that Morris used the guns in relation to the possession with intent to distribute offense, we affirm his conviction under § 924(c).

*It is so ordered.*

SILBERMAN, Circuit Judge:

I join the majority opinion, notwithstanding a sinking feeling that we are on an exceedingly slippery slope in determining when a gun is "used" and not "used" in relation to the crime of possession of drugs with the intent to distribute.