998 F.2d 1025
 302 U.S.App.D.C. 390, 37 Fed. R. Evid. Serv. 894
 UNITED STATES of America, Appellee,
v.
Larry LOGAN, Appellant.
UNITED STATES of America, Appellee,
v.
Tammy FELTON, Appellant.
UNITED STATES of America, Appellee,
v.
Corin ROBINSON, a/k/a Robin Helen Jenkins, Appellant.
UNITED STATES of America, Appellee,
v.
Kelvin RASCOE, Appellant.
 Nos. 91-3338 to 91-3340 and 92-3165.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 27, 1993.
Decided July 20, 1993.
 
 Nicholas G. Karambelas (appointed by the court) argued the cause for appellant Larry Logan in No. 91-3338.
 Paul Signet (appointed by the court) argued the cause for appellant Tammy D. Felton in No. 91-3339.
 Peter H. Meyers (appointed by the court) argued the cause for appellant Corin Robinson in No. 91-3340.
 Robert E. Morin (appointed by the court) argued the cause for appellant Kelvin Rascoe in No. 92-3165.
 Mary-Patrice Brown, Asst. U.S. Atty., argued the cause for appellee. On brief were Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas C. Black and Erik P. Christian, Asst. U.S. Attys.
 Before MIKVA, Chief Judge; HENDERSON and RANDOLPH, Circuit Judges.
 Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.
 Dissenting opinion filed by Chief Judge MIKVA.
 KAREN LeCRAFT HENDERSON, Circuit Judge:
 
 
 1
 Larry Logan was convicted on two counts of distribution of cocaine base (crack). Kelvin Rascoe and Tammy Felton were both convicted of possession with intent to distribute more than 5 grams of cocaine base. Corin Robinson was found guilty of possession with intent to distribute more than 5 grams of cocaine base and using a firearm in relation to a drug trafficking offense. Each now appeals seeking reversal. We affirm the convictions.
 
 I.
 
 2
 On February 27, 1991, a Metropolitan Police Department (MPD) officer, working undercover, purchased $40 of cocaine from a man at 22 14th Street N.E. When the officer knocked on the front door of the house, the man let the officer in and then went to the second floor to get the cocaine. The following day, Officer Condit, also of the MPD, examined the exterior of the house which he described as an "ordinary rowhouse." He then obtained a search warrant for the entire premises. On March 8 another undercover officer purchased cocaine from the same man who again went to the second floor to obtain the drugs. One hour later, the police, acting pursuant to the warrant, searched the house. In the basement they found Larry Logan, whom the two undercover officers immediately identified as the seller.
 
 
 3
 On the second floor of the house, the police discovered Corin Robinson leaving the front bedroom where another person was lying on the bed. Robinson later told police the room was hers. In it, they found nine ziplock bags of crack and five more loose rocks in a black leather jacket hanging in a closet. On the closet's top shelf, the police also found a loaded .357 Smith and Wesson revolver. In the middle bedroom, the police found Kelvin Rascoe and Tammy Felton. Upon entering the room, one officer saw Felton, who was sitting on a bed, lift up the mattress and place her hand between it and the box spring. Moments later, the police discovered three bags of crack beneath the mattress. They also found two crack pipes, 21 ziplock bags of crack and seven loose rocks strewn about the room.
 
 
 4
 At trial, Logan called Ricardo Tate to testify that Logan never left the basement the entire day of the search. Vivica Card, another witness for Logan, testified that she arrived at the house thirty minutes before the police and found Logan in the basement. During trial, Rascoe's counsel, James Holloway, and Robinson's counsel, Daniel McGuan, engaged in several acrimonious exchanges with the district court. Many, but not all, of the exchanges occurred at the bench or during motions conferences. One exchange resulted in the district court's holding Holloway in contempt. As a result of the friction, Holloway attempted to withdraw as counsel. Both McGuan and Holloway also moved for a [302 U.S.App.D.C. 393] mistrial several times. The trial judge refused to allow Holloway to withdraw and denied the mistrial motions. At the close of trial, the district court charged the jury on the elements of the offense of using or carrying a firearm in relation to a drug trafficking crime. See 18 U.S.C. § 924(c)(1).[1] Robinson, who had been charged with the offense, objected to the jury instruction.
 
 II.
 
 5
 A. Defense Counsel's Behavior (Robinson and Rascoe Only)
 
 
 6
 During the trial, Holloway, counsel for Rascoe, had several disagreements with the district court. As a result of one, the court held Holloway in contempt. We recently upheld the district court's finding of contempt in In re Holloway, 995 F.2d 1080, 1081 (D.C.Cir.1993). Although he was not held in contempt, McGuan, counsel for Robinson, also experienced friction with the court.
 
 
 7
 At the suppression hearing, Holloway asked Officer Condit whether the police discovered that the house was a rooming house when they searched it. The court sustained the government's objection but Holloway immediately asked it again. The court then cautioned Holloway not to repeat a question on which an objection had been sustained. 9/26 Tr. at 75-76. The next morning, Holloway filed a motion to withdraw as counsel. In it, he noted his belief that the hostility between himself and the district court stemmed from events in a trial immediately preceding Rascoe's in which the court twice threatened Holloway with contempt for his behavior. The district court denied Holloway's motion.
 
 
 8
 At trial, several incidents occurred as set forth in detail in In re Holloway. Holloway, 995 F.2d at 1082-86. One of the incidents resulted in Holloway's being found in contempt. Id. at 1082-84. Another episode involved Robinson's counsel, McGuan. At one point during cross-examination of an officer, McGuan attempted to determine whether the officer had set up his "raid kit" before drugs were seized from Robinson's bedroom. 10/2 Tr. at 26. The judge interrupted when McGuan's questions appeared to confuse the witness. When the judge made a suggestion in order to clarify the confusion, McGuan began to argue with her and with the witness in front of the jury. Id. at 27-30. After being instructed to proceed, McGuan then asked the witness, "How tall are you?" Id. at 30. The court ruled the question irrelevant, to which McGuan replied "not irrelevant." Id. The court then instructed McGuan to approach the bench and told him that "[t]his man's height is irrelevant. It was not brought on direct examination.... Don't you ever play games with me." Id. McGuan moved for a mistrial, addressing the court as "Your Honor, poor soul." Id. at 31.
 
 
 9
 Although these are not the only incidents to which the appellants direct our attention, they illustrate the nature of the exchanges between the district court and defense counsel. On appeal, Rascoe argues that the exchanges created the appearance that the court was not acting impartially and made it impossible for Holloway to represent him zealously. Accordingly, Rascoe maintains that the exchanges prejudiced the jury and denied him a fair trial.[2] Robinson raises an identical argument based on the exchanges between the district court and McGuan.
 
 
 10
 A judge must be a "disinterested and objective participant in the proceedings."[3] Thus, a trial judge must not create [302 U.S.App.D.C. 394] an appearance of partiality by supporting one of the parties nor may a judge "undermine the effective functioning of counsel through repeated interruption of the examination of witnesses." United States v. Norris, 873 F.2d 1519, 1526 (D.C.Cir.1989). Nonetheless, a trial judge has a "duty to prevent improprieties during the trial," United States v. Warner, 955 F.2d 441, 449 (6th Cir.1992), and may rebuke counsel for improper behavior. United States v. Jackson, 627 F.2d 1198, 1206 (D.C.Cir.1980). Thus, a judge may question witnesses to clarify confusing questions and otherwise actively manage the trial. See Norris, 873 F.2d at 1526; United States v. Polito, 856 F.2d 414, 418 (1st Cir.1988) (judge is not "mere umpire" but instead "governor of the trial" charged with "assuring its proper conduct").
 
 
 11
 In reviewing a claim of judicial bias, we need not determine "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." United States v. Pisani, 773 F.2d 397, 402 (2d Cir.1985). Rather, we must determine "whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to perfect, trial." Id.
 
 
 12
 A close reading of the trial transcript manifests that the district court was attempting to control difficult counsel who repeatedly flouted her orders. Her attempts to constrain both Holloway and McGuan were appropriate. In fact, at several points defense counsel's behavior invited upbraiding. To ensure a fair trial, the trial judge had a duty to require all counsel, including Holloway and McGuan, to abide by the orders she issued and to adhere to the rules of evidence and procedure. If she had taken no steps to correct their behavior, both the prosecution and the other defendants could have been placed at an unfair disadvantage. Allowing Holloway to examine the prosecution about the crack pipes, for example, could have prejudiced Felton's defense. It was Felton's counsel, not the prosecution, who initially objected to the questioning about the pipes.
 
 
 13
 Furthermore, we do not think the episodes between the district court and the two lawyers prejudiced the jury. The judge's instructions to Holloway and McGuan occurred in the main during bench conferences, during motions outside the jury's presence or during the suppression hearing. Thus, the jury never heard many of these exchanges. When the district court chastised Holloway for referring to the crack pipes, for example, she did so during a bench conference. Likewise, she denied Holloway's initial motion to withdraw as counsel during a motions hearing. Her finding of contempt occurred at the bench and thus out of the hearing of the jury. The kinds of exchanges the jury did hear involved sustaining of objections, denying of motions and ordering the rephrasing of questions to witnesses. Her instructions and comments were directed at McGuan and Holloway, not at the defendants.
 
 
 14
 Moreover, the district court explained her exchanges with the lawyers to the jury. In her charge, she stated that her "actions are not to be taken by you as any indication of my opinion as to how you should determine the issues of fact.... If you believe that I have expressed or intimated any opinion as to the facts, not only should you disregard it, I instruct you to totally disregard it." 10/11 Tr. at 19.
 
 
 15
 We turn now to Rascoe's argument that the conflict between Holloway and the district court intimidated Holloway and thus undermined his ability to provide Rascoe with zealous representation. Despite Holloway's assertions to the contrary, we find that his exchanges with the district court did not dampen his zealous (perhaps even overly so) representation of Rascoe. The record illustrates that Holloway repeatedly and aggressively pursued his client's cause. In fact, even after being adjudged in contempt, Holloway pressed a motion for mistrial. And he found himself in at least one more acerbic exchange with Judge Johnson. Moreover, both he and McGuan attempted to make the confrontations with the district court an issue in their closings, thus seeking to turn whatever discord the jury noticed between the judge and them to their clients' advantage. We conclude, therefore, that Holloway's and McGuan's difficulties with the judge did not [302 U.S.App.D.C. 395] affect their representation of their clients so as to deny them a fair trial.
 
 
 16
 B. The Section 924(c)(1) Jury Charge (Robinson Only)
 
 
 17
 An individual who "uses or carries a firearm" "during and in relation to a drug trafficking crime" violates 18 U.S.C. § 924(c)(1). Based on the police's discovery of a loaded handgun from the top shelf of Robinson's closet and crack cocaine from a leather jacket hanging in her closet, the government charged Robinson with violating section 924(c)(1). At the close of trial, the district court instructed the jury on the elements of the offense as follows:
 
 
 18
 The essential elements of this offense, each of which the government must prove beyond a reasonable doubt, are two in number. Number one, Ms. [Robinson][4] knowingly and intentionally carried or used a firearm. Number two, Ms. [Robinson] did so during and in relation to a drug trafficking crime as charged in count five of this indictment.
 
 
 19
 To find that Ms. [Robinson] carried or used the fire-arm the government must prove that Ms. [Robinson] actually or constructively possessed the firearm. The government does not have to show that Ms. [Robinson] actively employed the firearm in any manner. To satisfy the first element of this offense, it is sufficient if you find that at a given time Ms. [Robinson] had both the power and the intention to exercise dominion and control over the firearm....
 
 
 20
 The term 'during' means at some point in the course of the matter, regardless of how short a period of time. You are further instructed that possession with intent to distribute is a drug trafficking crime.
 
 
 21
 10/11 Tr. at 48-49.
 
 
 22
 On appeal, Robinson maintains that the jury instruction confused constructive possession with "using or carrying" and that the emphasis on possession improperly overshadowed all other section 924(c)(1) elements. The government contends that we must review for plain error and that, in any case, the district court's instructions explained the key elements of the offense to the jury.
 
 
 23
 To preserve an objection to jury instructions, a defendant must raise the specific objection before the trial court. United States v. Pryce, 938 F.2d 1343, 1350 (D.C.Cir.1991). Where a defendant raises only vague objections below that are "too general to alert the trial court to his current claim, our inquiry is limited to determining whether the instructions amounted to 'plain error.' " Id.; see also FED.R.CRIM.P. 52(b). Robinson's trial counsel objected to the proposed jury instruction at trial, but he did not argue that the instruction failed to describe correctly the elements of the offense. Counsel first told the court that the instruction was not "a fair statement of the law." 10/9 Tr. at 47. He then urged the court to strike any language regarding use and any instruction implying that Robinson had actual possession of the gun. Id. at 47-48. Accordingly, he told the court, "the government's theory on the weapon, as it pertains to Ms. [Robinson] or Mr. McFadden is merely one of constructive possession. There is no evidence of actual possession other than constructive possession." Id. at 48. Counsel then sought a different instruction on possession.[5] Finally, counsel objected to the definition of a firearm contained in the instructions and to the statement that possession with intent to distribute is a drug trafficking offense. Id. at 49. Although counsel clearly indicated his dissatisfaction with the jury instruction, he did not make the claim he makes here, that is, the instruction improperly equates constructive possession with using or carrying a firearm. In addition, the trial judge asked counsel to submit a proposed jury instruction of his own. Robinson's counsel did not submit one. We thus review for plain error only.
 
 
 24
 Constructive possession, standing alone, does not violate section 924(c)(1). "A [302 U.S.App.D.C. 396] person can possess a gun without either 'using' it or using it 'during and in relation to' a given crime." United States v. Long, 905 F.2d 1572, 1578 (D.C.Cir.1990). The government must also prove "a connection between the firearm and the underlying offense. This connection is at the heart of the statute." United States v. Jefferson, 974 F.2d 201, 206 (D.C.Cir.1992). The district court's instruction accurately describes both notions. The court told the jury that it must find both (1) that "Ms. [Robinson] knowingly and intentionally used or carried a firearm" and (2) that "Ms. [Robinson] did so during and in relation to a drug trafficking crime." 10/11 Tr. at 48 (emphasis added). The second part of the instruction conveyed to the jury that the gun must have "facilitated or had a role in the drug trafficking offense." United States v. Morris, 977 F.2d 617, 621 (D.C.Cir.1992).
 
 
 25
 Moreover, the district court did not err in telling the jury the government "must prove that Ms. [Robinson] actually or constructively possessed the firearm." 10/11 Tr. at 48. Although not sufficient by itself to sustain a conviction, possession is an essential element of the offense. "Generally speaking, it would be difficult to 'use' a gun without exercising dominion and control over it." Morris, 977 F.2d at 621.
 
 
 26
 Similarly, we find no problem with the district court's statement that "[t]he government does not need to show that Ms. [Robinson] actively employed the firearm in any manner." We have previously enumerated a number of factors which, under appropriate circumstances, might be sufficient to establish the necessary connection between the gun and the drug trafficking offense. Id. at 621-22. The element of "use" in section 924(c)(1), then, does not require the defendant to actually fire or brandish the firearm. Id. at 621; see also Smith v. United States, --- U.S. ----, ----, 113 S.Ct. 2050, 2053-54, 124 L.Ed.2d 138 (1993).
 
 
 27
 Next, we consider the district court's instruction that "the first element of the offense" could be satisfied if "Ms. [Robinson] had both the power and the intention to exercise dominion and control over the firearm." 10/11 Tr. at 48. The district court then defined a second element of the crime which it described as the requirement that Robinson used the firearm "during and in relation to a drug trafficking offense." Id. The second element, then, conveyed to the jury that the firearm must be connected to the drug offense. Because possession would not have satisfied the second element, which the district court characterized as "essential," its instruction cannot be read to have suggested that possession alone sufficed to violate section 924(c)(1). Id.
 
 
 28
 Finally, we consider Robinson's argument that the trial judge's emphasis on the possession element misled the jury. The instruction perhaps could have been more balanced had the district court enumerated the factors necessary to establish the required connection between the gun and the underlying drug trafficking offense. But the district court was not required to delineate further the elements of section 924(c)(1). In context, the court told the jury that it had to find possession plus a "second element." 10/11 Tr. at 48. The second element consisted of use "during and in relation to a drug trafficking crime." Id. This instruction points up the necessary connection between the firearm and the drug trafficking offense. Accordingly, we conclude that the district court's section 924(c)(1) charge was adequate.
 
 C. The Search Warrant
 
 29
 Because the search warrant failed to indicate the house was a boarding house, the appellants claim the police lacked probable cause to search the second floor bedrooms. This claim has no merit. Probable cause to obtain a warrant is judged from the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). Although a warrant must describe with particularity "the place to be searched," U.S. Const. amend. IV, "we must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted." Maryland v. Garrison, 480 U.S. 79, 85, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987).
 
 
 30
 The officers had probable cause to believe that drugs were located on the second [302 U.S.App.D.C. 397] floor of the house. Before seeking the warrant, an undercover officer gained entrance to the first floor and purchased cocaine from a man who went to the second floor to retrieve the drugs. Moreover, the officers had no reason to suspect that the house was not a single family residence when they applied for the warrant. Officer Condit visited the house before applying for the warrant and noticed nothing on the exterior to suggest that it was not a single family residence. There were no signs advertising rooms for rent, no rows of mailboxes, no multiple listing of names at the front door. 9/24 Tr. at 7-9. See United States v. Dorsey, 591 F.2d 922, 930 (D.C.Cir.1978) ("dearth of external indicia of multiple occupancy undercuts appellants' claims that the police knew or should have known that the ... dwelling served as a rooming house"). The officers reasonably believed that drugs were located on the second floor of the house and therefore probable cause supported their search.
 
 
 31
 D. Sufficiency of the Evidence (Felton Only)
 
 
 32
 Appellant Felton alleges that the government produced insufficient evidence to prove she placed three ziplock bags of cocaine between the mattress and the box spring of the bed on which she was sitting when police entered the room. In reviewing a conviction for sufficiency of the evidence, we are limited to determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Poston, 902 F.2d 90, 94 (D.C.Cir.1990). The government may prove constructive possession of a drug by showing that a defendant "was knowingly in a position or had the right to exercise dominion and control over it." United States v. Durant, 648 F.2d 747, 751 (D.C.Cir.1981) (quotation omitted).
 
 
 33
 The government produced sufficient evidence. At trial, one officer testified that, upon entering the room, he saw Felton "getting up off the mattress, picking up the mattress and putting something underneath." 9/30 Tr. at 84. The police discovered three bags of crack between the mattress and the springs. Another officer testified that he saw Felton put something under the mattress. Felton also testified that she and Rascoe lived in the bedroom. Cumulatively, this is strong circumstantial evidence of possession. Cf. United States v. Morris, 977 F.2d 617, 620 (D.C.Cir.1992).
 
 
 34
 E. Impeachment of Defense Witness (Logan Only)
 
 
 35
 Under Federal Rule of Evidence 609, a witness may be impeached during cross examination with evidence of a conviction for (1) a crime punishable by death or imprisonment in excess of one year or (2) a crime involving dishonesty or false statement, regardless of punishment. Fed.R.Evid. 609(a). Logan's witness, Ricardo Tate, testified that he and Logan never left the basement throughout the day of the search. On cross examination, the government impeached Tate with evidence that he had previously been convicted of taking property without a right and distribution of marijuana and PCP.
 
 
 36
 Tate's crimes were misdemeanors punishable by imprisonment for one year or less. Moreover, neither taking property without a right nor distribution of drugs constitutes a crime of dishonesty or false statement. See United States v. Lewis, 626 F.2d 940, 946 (D.C.Cir.1980) (heroin distribution does not involve dishonesty or false statement); United States v. Fearwell, 595 F.2d 771 (D.C.Cir.1978) (petit larceny is crime of stealth, not deceit); United States v. Scisney, 885 F.2d 325, 326 (6th Cir.1989) (shoplifting is not crime of dishonesty or false statement).
 
 
 37
 Nonetheless, the error was harmless for several reasons. First, the government used the convictions to impeach Tate, not Logan. Thus, the error here was less prejudicial than an improper impeachment of the defendant himself would have been. See United States v. Huddleston, 811 F.2d 974, 978 (6th Cir.1987) ("Any prejudice to the defendant is normally greater where the defendant's own character is being attacked."). Second, the prosecution did not emphasize the convictions, avoiding any reference to them in closing argument. Third, the court immediately [302 U.S.App.D.C. 398] instructed the jury that the convictions could be used only to assess Tate's credibility. Fourth, Vivica Card, another defense witness, confirmed at least part of Tate's story. Finally, the government had strong evidence against Logan apart from the ill-advised impeachment of his witness. Logan lived at the house. He was there during the police raid. Two undercover police officers identified Logan as the man who had sold them cocaine at the house on February 27 and March 8.
 
 III.
 
 38
 In summary, we conclude that the episodes between the trial judge and defense counsel Holloway and McGuan did not deprive appellants Rascoe and Robinson of a fair trial. In addition, we conclude that the district court's jury charge on the section 924(c)(1) offense sufficed. The other issues the appellants raise are without merit. Accordingly, we affirm the convictions of appellants Rascoe, Robinson, Logan and Felton.
 
 
 39
 AFFIRMED.
 
 MIKVA, Chief Judge, dissenting in part:
 
 40
 Serious errors were made in this trial that fundamentally affected the ability of at least three of the defendants to receive a fair hearing. The majority has chosen to excuse all of these errors and "imperfections." See Op. at 1029 (quoting United States v. Pisani, 773 F.2d 397, 402 (2d Cir.1985) (defendants are entitled to "a fair, as opposed to perfect, trial")). Certainly, no appellate judge takes pleasure in reversing criminal convictions when there is a good chance the evidence supports the verdicts. But we have no choice when they are convictions that have been obtained in violation of fundamental principles of fairness. Because these defendants failed to receive a fair trial, I respectfully dissent.
 
 I.
 
 41
 The trial was long and arduous. Tensions ran high between the trial judge and virtually all of the attorneys; biting sarcasm from the bench was not infrequent, nor were the attorneys always on their best behavior. The frustration and impatience which pervaded the entire proceeding is apparent from even the most casual reading of the transcript. It seems that the trial judge, as well as the attorneys, were nothing short of relieved when the trial finally drew to a close.
 
 
 42
 Almost lost in the clamor of the trial were the defendants, the individuals whose fate rested in the proceedings at hand. They quite possibly wondered to themselves whether they could receive a fair trial in this courtroom, in front of this jury. They were right to wonder.
 
 II.
 
 43
 The animosity between the trial judge and one particular attorney, Mr. Holloway, became apparent before the trial even began. During the pre-trial suppression hearing, Mr. Holloway attempted to rephrase a question to demonstrate that the question was, in fact, relevant. The judge viewed the rephrasing of the question to be a violation of her orders and she immediately threatened Mr. Holloway with contempt. The threat of contempt shocked Mr. Holloway and led him to believe that his representation would be jeopardized by the judge's obvious inclination to resort to contempt for any minor infraction of her orders. See In re Holloway, 995 F.2d 1080, 1081 (D.C.Cir.1993) (Mikva, C.J., dissenting).
 
 
 44
 The next morning, Mr. Holloway moved to withdraw as counsel for Mr. Rascoe, stating that in light of the court's threat of contempt, he felt a conflict between his personal and professional interest in avoiding a finding of contempt and his obligation to his client, Mr. Rascoe. 9/25 Tr. 33-37. The judge denied the motion to withdraw, stating that Mr. Holloway would not be held in contempt of court unless he behaved contemptuously, and made reference to a previous trial where Mr. Holloway refused to take his seat after being asked to do so. The judge added that "there is absolutely nothing inconsistent with your being able to represent Mr. Rascoe and your professional interest. There is no reason for you to fear being held in contempt because you will certainly be given full notice of it." Id. at 39.
 
 
 45
 [302 U.S.App.D.C. 399] The hostility between Mr. Holloway and the trial judge was obvious to the jury from the beginning of the trial. For example, on the first day of trial, Mr. Holloway asked a police officer during cross-examination whether "he saw anybody between the time that [he] left the first bedroom and the time [he] went to the second bedroom." The officer immediately replied: "Not that I recall." The judge interjected, however, and stated in front of the jury:
 
 
 46
 The Court: What do you mean anybody? Do you mean any other police officers who came into the house with him, anybody who appeared at the house? You see, you ask these broad questions. So, what do you mean by that question? Did you see any other individuals who were not police officers between the time you say you saw Ms. Robinson and the time you entered the second bedroom? Is that the question you are asking?
 
 
 47
 By Mr. Holloway: Well, Officer, when I asked the question if you observed anybody--
 
 
 48
 The Court: If you will answer my question.
 
 
 49
 Mr. Holloway: Well, I can clear it up.
 
 
 50
 The Court: If you will answer my question. If that's not what you are asking, simply say no.
 
 
 51
 Mr. Holloway: I was asking about anybody, and he answered that he did not see anybody.
 
 
 52
 The Court: All right. So he's talking about anybody at all, any living human being.
 
 
 53
 The Witness: At this time I don't recall.
 
 
 54
 9/30 Tr. at 53-54.
 
 
 55
 Friction continued between Mr. Holloway and the court throughout that day and the next few days. Although the majority of heated exchanges occurred at the bench, there were numerous instances where the jury was privy to the acrimonious debates. Other attorneys also suffered from unusually poor relations with the trial judge. Mr. McGuan, for example, the attorney for defendant Robinson, frequently became embroiled with the trial judge. On one such instance, the judge stated in open court that Mr. McGuan was acting like he was "out on a farm," and later told Mr. McGuan that she had been "on the verge" of holding him in contempt three to four times that day. When Mr. McGuan offered the court an idea "in the interest of speeding up everything," the judge cut him off, again stating in front of the jury: "Everybody is sick when they hear you say that." 10/3 Tr. at 135, 186-190. Admittedly, Mr. McGuan was hardly on his best behavior. At one point, Mr. McGuan was apparently frustrated by the judge's decision to interrupt his cross-examination sua sponte, and stated in front of the jury: "Your Honor, poor soul, you've eviscerated my concluding cross-examination by telling me how to identify premises...." 10/2 Tr. at 30-31.
 
 
 56
 Still, the animosity between Mr. Holloway and the judge was far more intense than that which existed between the judge and any of the other attorneys. On the third day of trial, during a bench conference that lasts four pages of the transcript, the court angrily lectured Mr. Holloway, accusing him of recalcitrance and rephrasing questions to get around her orders. At the end of the tirade, when Mr. Holloway was finally able to explain the bases for his examination, the judge conceded that he was entitled to pursue the line of questioning, but stated: "If one does something so ineptly that one cannot determine what one is doing, believe me it's a proper objection." 10/4 Tr. at 67. Then, after the bench conference ended, the hostility spilled over in front of the jury. Apparently in response to the witness' demeanor, Mr. Holloway's first question was "would you like to share the joke with us?" After an objection was made, the court stated "the objection is sustained. Who says there is any joke. How dare you?" Id. at 68.
 
 
 57
 Throughout that day, sarcastic remarks by the judge to Mr. Holloway were frequent, and the judge often sua sponte sustained "objections" that had not been made by any counsel to questions she believed had been asked and answered. Whenever the judge believed Mr. Holloway stepped over the line in his questioning, she would lecture him pointedly.
 
 
 58
 After the weekend recess, the trial continued. So did the animosity. The judge refused [302 U.S.App.D.C. 400] to let Mr. Holloway voice his position regarding the Fifth Amendment privilege of one of the witnesses he subpoenaed, even though the judge heard from other attorneys on this subject. 10/7 Tr. at 22. Shortly thereafter, Mr. Holloway stood to address the court. The court asked him to be seated, but Mr. Holloway stated that he wished to be heard on a motion for a mistrial before the jury returned. The court, noting that it had just ruled on motions for judgments of acquittal the Friday before, refused to allow Mr. Holloway to state the grounds for the requested mistrial, indicating that the motion would have to be heard at some other time. Id. at 27.
 
 
 59
 The next day, Mr. Holloway again requested that the court listen to his request for a mistrial. The judge stated that he could have "not more than one minute. That's about all the argument I need to hear." 10/8 Tr. at 7. Mr. Holloway then restated his earlier grounds for a mistrial and stated that he wished to set forth new grounds that the court had refused to hear earlier. The judge interrupted him, stating that he had used his "minute plus." Mr. Holloway asked for 20 more seconds, but the judge refused to let him finish his sentence. After hearing from the prosecutor, the court offered Mr. Holloway rebuttal for "30 seconds." Mr. Holloway stated:
 
 
 60
 Your Honor, if it please the court, I must place on the record in representing Mr. Rascoe the fact that your honor has denied me on several opportunities the chance to speak and to make representations for the record to protect Mr. Rascoe's rights. Your Honor has given other counsel a chance to address matters, to speak, to make objections on the record and has simultaneously with giving other counsel the chance to speak has denied me that opportunity.
 
 
 61
 The judge responded that he had used his "30 seconds" and added that it "must be a figment of your imagination, because the record will certainly demonstrate to the contrary." Id. at 7-13. Mr. Holloway tried to give examples to the court, but the court refused to hear him.
 
 
 62
 Later that day, Mr. Holloway was held in criminal contempt of court for allegedly evading the court's orders in his examination of a police officer. See In re Holloway, 995 F.2d 1080 (D.C.Cir.1993) (Mikva, C.J., dissenting). After the contempt citation, the relations between them did not improve. Mr. Holloway was clearly exasperated by the end of the day, when the judge ruled that the testimony of Mr. Rascoe's mother was irrelevant and should be excluded. 10/8 Tr. at 165-66.
 
 
 63
 The following day, Mr. Holloway filed his second written motion to withdraw as counsel for Mr. Rascoe. He explained that his contempt citation made it impossible for him to fulfill his ethical duty to Mr. Rascoe:
 
 
 64
 This contempt ruling has put the defendant's counsel in a conflict of interest situation relative to the interests of the defendant in this case. Counsel has explained to the defendant that counsel's interests in avoiding being fined or sentenced to a period of incarceration at the end of the trial has eviscerated his ability to be a zealous advocate for the defendant. Moreover, counsel's impending sentence at the conclusion of the trial has severely distracted him from his preparation of his closing argument. Counsel has been unable to sleep and concentrate totally on the presentation of the defendant's case.... Counsel's family, personal and professional life have been deeply affected.... The possibility of substantial fine or a period of incarceration has caused considerable fear, uncertainty and anxiety among counsel and his wife. Accordingly, counsel's effectiveness has been undermined and threatens to affect his performance during the remainder of the trial.
 
 
 65
 The judge declined to consider the motion that day. The next day, the court addressed the issue of the pending motions for mistrial. Mr. Holloway mentioned that he also had a pending motion to withdraw as counsel for Mr. Rascoe. The judge told him that he could either wait until the government had a chance to respond to the written motions or he could make his motions orally, but he could not do both. After making his motion for mistrial orally, Mr. Holloway stated that he would "stand on the papers" with respect [302 U.S.App.D.C. 401] to his motion to withdraw as counsel for Mr. Rascoe. The court responded:
 
 
 66
 The Court: You have already withdrawn the written motion.
 
 
 67
 Mr. Holloway: Not the motion to withdraw. I will not make that motion orally. I will rely on the motion that I filed.
 
 
 68
 The Court: You just told me you were withdrawing them and I ruled that your written motions were withdrawn.
 
 
 69
 Mr. Holloway: I move for a mistrial.
 
 
 70
 The Court: No, sir. You stood up and said you were ready, willing and able to go forward. Now, it is withdrawn. If you want to argue it orally, you are out of time. Thank you.
 
 
 71
 Mr. Holloway: I move for a mistrial.
 
 
 72
 The Court: You are out of time.
 
 
 73
 10/10 Tr. at 23-24.
 
 
 74
 After denying the motions for mistrial, the court discussed various instructions with counsel. After Mr. Holloway discussed a defense instruction with the court, he indicated that he had another request, which the court refused to hear:
 
 
 75
 Mr. Holloway: Would Your Honor consider, in light of the fact that the trial has lasted over two weeks--
 
 
 76
 The Court: The Court will not reconsider. The Court considered all of that.
 
 
 77
 Mr. Holloway: I haven't finished.
 
 
 78
 The Court: You don't have to. I know what you are thinking.
 
 
 79
 Mr. Holloway: What is it?
 
 
 80
 The Court: I know, and the answer is no.
 
 
 81
 Mr. Holloway: What answer?
 
 
 82
 The Court: No matter what you ask, the answer is no. All right.
 
 
 83
 Mr. Holloway: I haven't said what I'm asking you. You can't rule on something I haven't asked.
 
 
 84
 The Court: You would be surprised how I am able to. Thank you, Mr. Holloway.
 
 
 85
 Mr. Holloway: At some point this may be reviewed, Your Honor.
 
 
 86
 The Court: At some point it may be reviewed.
 
 
 87
 Mr. Holloway: How can the Court of Appeals read your mind or my mind?
 
 
 88
 The Court: They will be able to read my mind.
 
 
 89
 Mr. Holloway: Do you understand what my request is?
 
 
 90
 The Court: Do you understand that I am saying no to you and asking you to sit down?
 
 
 91
 10/10 Tr. at 29-30. Shortly thereafter, the jury returned a verdict of guilty against all of the defendants, including Mr. Rascoe.
 
 
 92
 The judge's refusal to allow Mr. Holloway to withdraw as counsel for Rascoe, particularly after Mr. Holloway was convicted of criminal contempt, constitutes reversible error. Mr. Holloway plainly had a conflict of interest, and the trial judge's refusal to recognize the implications of his perceived dilemma fundamentally affected the fairness of the proceedings.
 
 
 93
 This case is analogous to United States v. Hurt, 543 F.2d 162 (D.C.Cir.1976). In that case, a claim of ineffective assistance of counsel was lodged against the trial counsel. New counsel was appointed to represent the appellant on appeal and the case was remanded for a development of the record on the claim of ineffective assistance of counsel. During the remand, the trial counsel filed a libel suit against appellate counsel based on the assertion of ineffective assistance of counsel. Appellate counsel promptly moved to withdraw from the case on the grounds that he feared that his representation of the appellant could aggravate the civil action. His motion to withdraw was denied by the trial judge. On appeal of his client's case, we held that even though the appellate counsel's fears were unfounded, there was a conflict of interest because to the attorney, the fears were "very real." Id. at 162. We explained that competition between the client's interests and the counsel's own interests "corrupts the relationship," particularly "when the counsel's duty to his client calls for a course of action which concern for himself suggests that he avoid." Id. at 166.
 
 
 94
 This case arguably presents a more serious conflict of interest than that found even in Hurt. While the fears of the attorney in Hurt were unfounded, here Mr. Holloway's fears were not only rational but realized; I [302 U.S.App.D.C. 402] have previously expressed my view that Mr. Holloway was held in contempt of court for doing no more than vigorously representing his client's interests in the face of an ambiguous ruling from the court. See In re Holloway, 995 F.2d at 1089-90 (Mikva, C.J., dissenting). Moreover, after being held in contempt, Mr. Holloway had good reason to fear that aggressive representation of his client could result in an increased penalty for his contempt conviction. Mr. Holloway legitimately felt that he was forced to choose between his personal interest in avoiding a severe sentence and his client's interest in a zealous defense.
 
 
 95
 Yet even if Mr. Holloway's feelings of personal conflict were unwarranted, the decision in Hurt makes clear that a finding of an actual conflict of interest does not turn on whether the attorney's perception of the conflict is reasonable. The question is whether, under the circumstances, there is good reason to believe that the perceived conflict of interest would jeopardize the attorney's ability to represent his client. Here, just as in Hurt, the "personal concerns loomed large to counsel," particularly after he was summarily held in contempt. Hurt, 543 F.2d at 162.
 
 
 96
 The majority attempts to brush over the seriousness of the problem at hand by dismissing the notion that Mr. Holloway was "intimidated" by the trial judge and therefore unable to provide him with a zealous defense. The majority speculates that Mr. Rascoe must have received a fair trial, despite his attorney's perceived conflict of interest, because it appears from the transcript that Mr. Holloway's "exchanges with the district court did not dampen" his zeal. Op. at 1029. The majority notes that "even after being adjudged in contempt, Mr. Holloway pressed a motion for mistrial." Id.
 
 
 97
 It is hard to perceive a motion for mistrial as being excessively zealous in light of this kind of a trial record. More importantly, the majority's approach to Mr. Rascoe's claim flies in the face of our holding in Hurt. As we explained in that case, where an attorney articulates a perceived conflict of interest and requests removal from a case on those grounds, failure to grant that request may constitute reversible error regardless of whether a clear showing of prejudice can be made:
 
 
 98
 The Government points out that appellant does not suggest in retrospect anything that appellate counsel intended to undertake at the hearing that he did not feel free to do. This attempt to minimize the problem ignores the incontrovertible fact that appellate counsel was adamantly opposed to doing anything at all, and that he proceeded only because the court ordered him to do so.... Try as we might, we could not approximate the effect which the overhanging threat of a libel suit had on the vigor of counsel's endeavors at the remand hearing. In sum, the prejudice in the circumstances involved here is incapable of any sort of measurement.
 
 
 99
 Hurt, 543 F.2d at 168.
 
 
 100
 Thus, the majority's decision is not only inconsistent with the case law of this circuit, but sets up a Catch 22 alternative. As the Seventh Circuit remarked in Walberg v. Israel, 766 F.2d 1071, 1076 (7th Cir.), cert. denied, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985): "It is not right that the state should be able to say 'sure we impeded your defense--now prove it made a difference.' " It is enough that the conflict of interest "appreciably reduced the likelihood that [the attorney] would conduct a vigorous defense." Id. That standard is easily met here. Logan should be granted a new trial.
 
 III.
 
 101
 Aside from the trial judge's failure to release Mr. Holloway from his representation of Mr. Rascoe, and the numerous inappropriate remarks which were made in front of the jury by the court and trial counsel, there was a clearly erroneous evidentiary ruling which fundamentally undermined the fairness of the proceedings. In clear contravention of the Federal Rules of Evidence, the trial judge allowed the prosecutor to impeach defendant Logan's alibi witness with evidence of his prior misdemeanor convictions.
 
 
 102
 In this case, Mr. Logan was charged with selling cocaine to an undercover officer on the first floor of a house located at 22 Fourteenth Street, N.E. The sale allegedly occurred [302 U.S.App.D.C. 403] 50 minutes before a search warrant was executed at that address. Mr. Logan's chief witness, Ricardo Tate, provided Mr. Logan with an alibi. Mr. Tate testified that he had slept in Mr. Logan's room in the basement the night before the police raid. The next morning, he and Mr. Logan went upstairs for breakfast but spent the rest of the day together downstairs, in the basement, watching television. Mr. Tate testified that he was able to see Mr. Logan at all times, and that Mr. Logan never left the basement after breakfast, even for a moment, until the police raid.
 
 
 103
 To impeach Mr. Tate's testimony, the prosecutor sought to introduce evidence of Mr. Tate's prior misdemeanor convictions. Defense counsel for Mr. Logan strenuously objected; he argued that the convictions were misdemeanors and therefore inadmissible under Rule 609 of the Federal Rules of Evidence. Both the trial judge and the prosecutor admitted that they simply did not know whether the convictions were misdemeanors. Nevertheless, the trial judge decided to take a gamble and resolve her doubts in favor of the prosecution.
 
 
 104
 Neither the government nor the majority disputes that the trial judge erred in allowing the prosecutor to impeach Mr. Tate with the evidence of his misdemeanor convictions. Indeed, error is incontrovertible since Rule 609 states quite plainly that the government is entitled to impeach the credibility of a witness only with evidence that the witness has been convicted of a felony or a crime "involv[ing] dishonesty and false statement." Fed.R.Evid. 609.
 
 
 105
 What is striking, though, is the majority's dismissal of the error as "harmless," partially on the grounds that the misdemeanor convictions were used to impeach Mr. Tate, not Mr. Logan. According to the majority, the potential for prejudice is significantly reduced when it is the defendant's witness that is erroneously impeached rather than the defendant himself. The only case the majority cites in support of this remarkable proposition is a Sixth Circuit case which merely states that "prejudice to the defendant is normally greater where the defendant's own character is being attacked." See United States v. Huddleston, 811 F.2d 974, 978 (6th Cir.1987) (emphasis added).
 
 
 106
 But certainly, in cases such as this, where the defendant chooses not to take the stand and decides instead to present his case solely through the testimony of others, the potential for prejudice from the improper impeachment of these witnesses is greater than if the defendant had also taken the stand and told his story. By the same token, if the witness that is improperly impeached happens to be the defendant's chief witness, there is hardly any reason to believe that the improper impeachment was perfectly "harmless."
 
 
 107
 The majority makes no attempt to distinguish between cases where the defendant's chief witness is improperly impeached and cases where the witness is merely corroborating a minor detail; nor does the majority appear to appreciate the significance of defense witnesses when the defendant fails to take the stand. Whenever a defendant exercises his Fifth Amendment right not to testify, the jury has little choice but to evaluate the testimony of his witnesses as if it was the testimony of the defendant himself.
 
 
 108
 The majority does not dwell on these considerations. In fact, the majority does not even address them. In the majority's view, no harm was caused by the improper impeachment of Mr. Logan's chief witness because the prosecution failed to emphasize the misdemeanor convictions and the court provided a limiting instruction. The majority also notes that "the government had strong evidence against Logan apart from the ill-advised impeachment of his witness." Op. at 1033.
 
 
 109
 Unfortunately, the circumstances the majority cites in support of its finding of "harmless" error will exist in almost every case misdemeanor evidence is improperly admitted. This is troubling since Rule 609 was specifically drafted to protect defendants from the prejudice that was presumed to flow from the introduction of certain types of evidence against witnesses for the purpose of impeachment. The majority has virtually nullified Rule 609 by determining that the potential for prejudice is lessened by circumstances that easily could be present in the [302 U.S.App.D.C. 404] vast majority of cases involving improper impeachment. Moreover, by defining as "harmless" the improper impeachment of a defendant's chief witness, the majority has ignored the crucial role Tate played in this trial and the crucial role defense witnesses play in every trial--particularly where the defendant has exercised his Fifth Amendment right not to testify.
 
 IV.
 
 110
 Finally, I believe that the jury instruction on the section 924(c) count is fatally flawed. See 18 U.S.C. § 924(c)(1). The jury instruction in question not only ignores the critical distinction between mere possession and actual use under the statute, but directs the jury to convict the defendant of "use" of a firearm under that section if the defendant merely possessed the firearm at the same time that the defendant committed a drug trafficking offense. This is a total misstatement of the law and could not possibly have left the jury with a correct understanding of its duty with respect to defendant Robinson.
 
 
 111
 During the police raid, Ms. Robinson told the police that the front bedroom was "[her] room" and was seen exiting that room when the police ascended the stairs. 9/30 Tr. at 124. Inside that room, the police found a black leather jacket hanging on a door. One pocket of the jacket contained a baggie holding 17.3 grams of cocaine base. On the top of a built-in closet in the bedroom, hidden from view, was a .357 Smith and Wesson revolver, loaded with six rounds of ammunition. The jury convicted Ms. Robinson of "use" of a firearm "during and in relation to" a drug trafficking offense in violation of section 924(c).
 
 
 112
 Before jury deliberations began, the court instructed the jury on the 924(c) count as follows:
 
 
 113
 ... I will now instruct you as to the law which applies to possession of a firearm during a drug trafficking offense.
 
 
 114
 The essential elements of this offense, each of which the government must prove beyond a reasonable doubt, are two in number. Number one, Ms. [Robinson] knowingly and intentionally carried or used a firearm. Number two, Ms. [Robinson] did so during and in relation to a drug trafficking crime as charged in count 5 of this indictment.
 
 
 115
 To find that Ms. [Robinson] carried or used the firearm, the government must prove that Ms. [Robinson] actually or constructively possessed the firearm. The government does not have to show that Ms. [Robinson] actively employed the firearm in any manner. To satisfy the first element of this offense, it is sufficient if you find that at a given time Ms. [Robinson] had both the power and the intention to exercise dominion and control over the firearm....
 
 
 116
 The term "during" means at some point in the course of the matter, regardless of how short a period of time.
 
 
 117
 This jury instruction states in the plainest of language that the jury should convict Ms. Robinson under section 924(c) if Ms. Robinson constructively possessed the firearm at some point when she constructively possessed the drugs with the intent to distribute. It is well established that "mere possession" of a firearm during and in relation to a drug trafficking offense is not enough to support a conviction under the statute. See, e.g., United States v. Jefferson, 974 F.2d 201, 205 (D.C.Cir.1992). The cases in this circuit have uniformly required not only a "nexus ... between a particular drug offender and a firearm," United States v. Long, 905 F.2d 1572, 1577 (D.C.Cir.1990), but also that "the gun[ ] facilitated the predicate offense in some way." Jefferson, 974 F.2d at 205.
 
 
 118
 While the distinction between "actual" and intended use is subtle in section 924(c) cases, it is absolutely critical. See United States v. Bruce, 939 F.2d 1053 (D.C.Cir.1991) (conviction reversed under section 924(c) where the government established only intended use of the firearm). As we explained in Bruce, section 924(c) was carefully drafted to avoid the criminalization of mere possession. Id. at 1055. By eliminating the distinction between possession and actual "use" in the jury instructions, the trial judge made the defendant subject to a criminal conviction for engaging in conduct which does not constitute a federal crime.
 
 
 119
 [302 U.S.App.D.C. 405] The majority tries to cloud this obvious dilemma by suggesting that Ms. Robinson's defense counsel raised too vague an objection to this instruction below, and therefore the instruction will be reviewed only for plain error. I think it is patent that Ms. Robinson's attorney clearly objected to the instruction as drafted. In any event, even under this heightened standard of review that the majority proffers, reversal is clearly required. Under no standard of review, no matter how high, can the conflation of mere possession with actual "use" in a section 924(c) case be deemed "harmless."
 
 
 120
 The majority's defense of the jury instruction rests on its observation that the jury was told to find "possession plus a 'second element.' " Op. at 1031. Interestingly, the jury instruction never defines the second element which the majority believes saves the integrity of the instruction. But more importantly, there is no getting around the fact that the trial judge, when discussing the first element, explicitly defined "use" as constructive possession. Nothing in the jury instruction serves to contradict this plainly erroneous statement of law. Quite simply, Ms. Robinson was tried for a federal crime that does not exist.
 
 V.
 
 121
 The entire trial under review was hardly a model for fairness. Whether it was a matter of bad chemistry between the bench and bar, or merely bad semantics, I cannot read the trial record without dismay at the deviations from the fairness due any criminal defendant. Whatever the appropriate allocation of fault between the trial judge and the trial lawyers, the defendants were denied the full, fair day in court that constitutionally and traditionally must precede their loss of liberty. I dissent.
 
 
 
 [1]
 Section 924(c)(1) provides:
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.
 18 U.S.C. § 924(c)(1).
 
 
 [2]
 In his brief, Rascoe relied on Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), asserting that counsel's breach of the duty of loyalty to his client presumptively prejudices the trial. Nonetheless, at oral argument, Rascoe's counsel declared that Rascoe did not raise an ineffective assistance of counsel claim. Accordingly, we consider Rascoe's arguments pertinent only to his claim that he was denied a fair trial
 
 
 [3]
 United States v. Norris, 873 F.2d 1519, 1526 (D.C.Cir.1989); United States v. Barbour, 420 F.2d 1319, 1321 (D.C.Cir.1969); Billeci v. United States, 184 F.2d 394, 403 (D.C.Cir.1950)
 
 
 [4]
 The district court referred to Robinson by her alias, Corin Jenkins
 
 
 [5]
 Counsel sought the instruction on possession included in the Criminal Jury Instructions District of Columbia manual (Red Book). 10/9 Tr. at 48. The Red Book Instruction 3.11 contains no discussion of a section 924(c)(1) offense